967 F.2d 590
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Victor SALAS-OCAMPO, Petitioner
v.
U.S. IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 91-70122.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 8, 1992.
Decided June 3, 1992.
 
 Before TANG, SCHROEDER and BEEZER, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Victor Salas-Ocampo petitions for review of a Board of Immigration Appeals decision and order which denies section 212(c) relief. Salas-Ocampo argues that, despite his drug conviction and criminal record, he qualifies for the discretionary waiver of deportation because of his lengthy residence in the United States, his family ties here and his rehabilitation efforts. We have jurisdiction pursuant to 8 U.S.C. § 1105a(a) and we deny the petition.
 
 
 3
 * Victor Salas-Ocampo, a forty-two year old native and citizen of Mexico, was six months old when his mother sent him from Mexico to live with her sister, Josefina Ocampo, in Texas. In 1964, Salas-Ocampo became a lawful permanent resident. Several relatives and his two children live in the United States. He is divorced from the children's mother and says he is trying to re-establish contact with the children.
 
 
 4
 Salas-Ocampo attended Texas schools through the tenth grade and then held a series of jobs in Michigan, Texas and California. He also took a forklift engineering course in California and high school classes while in federal prison. Salas-Ocampo has paid only brief visits to Mexico and his connections there are marginal.
 
 
 5
 According to Salas-Ocampo, he "fell in with the wrong crowd and experienced the difficulties with the law that caused [the deportation proceedings.]" In 1968, he was convicted of carrying a knife. In 1971, he received a suspended sentence for assault and battery. In 1974, he was arrested while in possession of about two ounces of heroin that he intended to sell and a concealed handgun. The drug charge was dropped and he received a year's probation. Also in 1974, a search of the van Salas-Ocampo drove across the Mexican border revealed a small amount of heroin and an unregistered firearm in the spare tire compartment. He said the heroin belonged to a friend.
 
 
 6
 In 1975, he was arrested in Detroit for possession with intent to distribute almost two pounds of heroin. He explained that he had not intended to sell the heroin, but had merely accepted an acquaintance's offer to store it for $1,000. Salas-Ocampo made several court appearances and was released on a $15,000 cash bond. He says that in the spring of 1976, someone told him that the charges were dropped, because, he assumed, of questions about the admissibility of the evidence. He, his wife and their two children moved to Texas, without contacting Salas-Ocampo's lawyer, without attempting to retrieve the bail money and in violation of his bond agreement.
 
 
 7
 In 1982, he was arrested for driving while intoxicated and charged with possession of a small quantity of marijuana. Also in 1982, he was arrested for aggravated assault. Although the woman who filed the complaint later dropped the charges, the INS picked him up at the jail and he was voluntarily deported to Mexico. He accepted voluntary departure under the name Victor Duque, his grandfather's name and the name under which he had been working for two years. He was in Mexico only long enough to stop in a store and walk to another bridge leading to the United States.
 
 
 8
 In September 1983, Salas-Ocampo was arrested on the drug charge stemming from his 1975 arrest and extradited to Michigan. In April, 1984, he pled guilty to possession of heroin with intent to distribute and was sentenced to eight years in prison.
 
 
 9
 In December 1988, the INS commenced deportation proceedings against Salas-Ocampo by issuing an order to show cause, charging that he was deportable pursuant to 8 U.S.C. § 1251(a)(11), in light of his heroin conviction. Salas-Ocampo conceded deportability and applied for a waiver of deportation under section 212(c) of the Act, 8 U.S.C. § 1182(c).[1] Because Salas-Ocampo met section 212(c)'s statutory requirements, the sole question was whether discretion should be exercised in his favor.
 
 
 10
 The immigration judge heard testimony from Salas-Ocampo, his Aunt Josefina, and his childhood friend, the Rev. Jesus Hernandez. All three testified about his remorse, his desire to change his ways and his ties to the United States. The immigration judge also reviewed statements attesting to Salas-Ocampo's good character, his job prospects and his connections with relatives who offered to provide him support and shelter.
 
 
 11
 On May 8, 1989, the immigration judge rendered an oral decision granting Salas-Ocampo a waiver of deportation. The judge stated that it was "a very close call." As he explained,
 
 
 12
 [T]he respondent has managed to avoid convictions for any serious criminal conduct during the period from 1976 to 1983, although I'm satisfied that at the time he was knowingly absconding from the authorities in Detroit.... [G]iven the relatively long period of time in which he was not involved in any serious criminal conduct, plus the evidence that is in the record concerning the chances for his leading a legal life [if he is] allowed to remain in the United States, that by a very small measure the balance of the equities is in his favor.... [T]he very strong equity in the case is the fact that the respondent has lived in the United States since a very early age.
 
 
 13
 The judge found that Salas-Ocampo was, "in general," credible. He expressed reservations, however, about Salas-Ocampo's "tend[ency] to minimize his criminal involvement," and his improbable explanation of why he left Michigan in the face of a pending drug trial. The INS appealed.
 
 
 14
 On September 4, 1990, the BIA reversed the immigration judge's decision and denied Salas-Ocampo section 212(c) relief. Essentially, the BIA weighed the equities differently, putting more emphasis on Salas-Ocampo's criminal record. As the BIA explained,
 
 
 15
 We ... conclude that the equities presented by the respondent in his behalf do not outweigh the gravity of his conviction so as to support a grant of section 212(c) relief. Besides the respondent's conviction for trafficking a large amount of an extremely dangerous controlled substance, an offense which in and of itself triggers the necessity for a heightened showing of unusual and outstanding equities, the respondent also has weighing against him a string of criminal activity. Conversely, we are unable to characterize the respondent's equities as unusual or outstanding.
 
 
 16
 The BIA specifically disagreed with the immigration judge's determination that Salas-Ocampo has demonstrated rehabilitation. Pointing to Salas-Ocampo's criminal record, the BIA stated that "[w]e do not agree that his serious criminal misconduct ceased after his arrest for heroin trafficking in 1975." Salas-Ocampo timely filed a petition for review with this court.
 
 II
 
 17
 We review the BIA's denial of section 212(c) relief for abuse of discretion. Vargus v. U.S. Dep't of Immigration and Naturalization, 831 F.2d 906, 908 (9th Cir.1987). We may set aside the BIA's decision and order "only if the board fails to support its conclusions with a reasoned explanation based upon legitimate concerns." Id. (citation omitted). Although we review the BIA's decision, we may properly consider the immigration judge's decision if, as in this case, it conflicts with that of the BIA. Hernandez-Robledo v. Immigration and Naturalization Service, 777 F.2d 536, 539 (9th Cir.1985).
 
 
 18
 The BIA requires that the equities be unusual or outstanding before it will grant section 212(c) relief to an applicant who, like Salas-Ocampo, has been convicted of a serious drug offense. Matter of Marin, 16 I. & N. Dec. 581, 586 n. 4 (1978), withdrawn in part on other grounds, Matter of Edwards, I. & N. Interim Dec. No. 3134, at p. 8 (1990); see also Ayala-Chavez v. U.S. Immigration and Naturalization Service, 944 F.2d 638, 641 (9th Cir.1991) (explaining the higher standard for drug offenders). We have stated that this standard is "rationally based upon the [Immigration and Nationality] Act's manifest concern with drug activity by lawful permanent residents.... [and] represents a permissible interpretation of the Act." Ayala-Chavez, 944 F.2d at 641. Accordingly, the BIA appropriately applied this higher standard to Salas-Ocampo's case.
 
 
 19
 The BIA reasoned that the factors weighing in Salas-Ocampo's favor were not unusual or outstanding. He has spent virtually his entire life in the United States, but he does have some ties to Mexico. Additionally, although several of Salas-Ocampo's relatives and his two children live in the United States, he has little contact with them. None are dependent upon him for support.
 
 
 20
 The Board explained in detail the basis for its determination that Salas-Ocampo had not demonstrated rehabilitation. It considered the immigration judge's contrary determination, and also drew on the concerns the judge had noted. The BIA's reasoning is supported by the record and does not reflect an usurpation of the immigration judge's role. The BIA did not dispute the immigration judge's finding that Salas-Ocampo was generally credible. Rather, the Board looked to the record and concluded, contrary to the immigration judge's analysis, that Salas-Ocampo's serious criminal conduct did not cease after his 1975 arrest. The BIA agreed with the immigration judge's finding that Salas-Ocampo's explanation as to why he left Michigan should not be accepted.
 
 
 21
 In the BIA's determination, Salas-Ocampo's drug conviction and criminal record weighed heavily against granting a section 212(c) waiver. This determination accords with others we have upheld.
 
 
 22
 For example, in Ayala-Chavez, we upheld the denial of section 212(c) relief to a lawful permanent resident who had been convicted of cocaine possession and had been declared a habitual traffic offender. 944 F.2d at 640. Ayala-Chavez had lived in Eastern Washington for 18 years, commencing when he was nine years old. Most of his family, as well as the minor daughter whom he supported, resided legally in Eastern Washington. 944 F.2d 640, 642. After determining that the BIA had considered these factors, we held that "in light of our narrow standard of review, we cannot say that the BIA abused its discretion." 944 F.2d at 642. Salas-Ocampo does not present a more compelling case than did Ayala-Chavez.
 
 
 23
 The BIA provided a reasoned explanation based on legitimate concerns to support its conclusion that "a favorable exercise of discretion is not warranted." It did not abuse its discretion in rejecting the immigration judge's decision and in ordering Salas-Ocampo deported.
 
 III
 The petition for review is
 
 24
 DENIED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to by the courts of this circuit except as provided by Ninth Circuit R. 36-3
 
 
 [1]
 Although the language of section 212(c) refers only to the admission of aliens, we have interpreted it to apply in deportation proceedings. Gonzales v. Immigration and Naturalization Service, 921 F.2d 236, 238 (9th Cir.1990) (citing Tapia-Acuna v. Immigration and Naturalization Service, 640 F.2d 223, 224 (9th Cir.1981)). "Section 212(c) thus provides discretionary relief from deportation for aliens lawfully admitted for permanent residence who have accrued seven consecutive years of lawful unrelinquished domicile." Id